**CITY OF JEANNETTE, Petitioner**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 18, 2005.

Decided Jan. 19, 2006.

Gary A. Falatovich, Greensburg, for petitioner.

Jack E. Marino, Harrisburg, for respondent.

Eric C. Stoltenberg, Pittsburgh, for intervenor.

BEFORE: SMITH–RIBNER, Judge, COHN JUBELIRER, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge SMITH–RIBNER.

The City of Jeannette petitions the Court for review of the final order of the Pennsylvania Labor Relations Board that dismissed the City's exceptions and made absolute and final the hearing examiner's proposed decision and order. The hearing examiner determined that the City committed an unfair labor practice and directed that the City, *inter alia,* cease and desist from refusing to bargain collectively with representatives of its employees, the Fraternal Order of Police, Lodge 24 (FOP). The questions include whether the assignment of Chief of Police Jeffrey Stahl (Chief Stahl) to the 8:00 p.m. to 4:00 a.m. patrol shift in place of a bargaining unit member without first bargaining with the FOP constitutes an unfair labor practice and whether the Board's decision interferes with the City's managerial prerogative to determine the nature and extent of police services and police coverage to be provided to the City. The FOP has intervened in the City's appeal to this Court.

On January 30, 2004, the FOP filed its unfair labor practice charge against the City alleging that the assignment of Chief Stahl to the 8:00 p.m. to 4:00 a.m. patrol shift on December 19, 2003 constituted removal of work from the bargaining unit without bargaining in violation of Section 6(1)(a) and (e) of the Pennsylvania Labor Relations Act (PLRA), Act of June 1, 1937, P.L. 1168, *as amended,* 43 P.S. § 211.6(1)(a) and (e),[1] and Section 1 of the Act commonly known as Act 111, Act of June 24, 1968, P.L. 237, 43 P.S. § 217.1.[2] The City asserted that work performed by Chief Stahl was not exclusively performed by the bargaining unit and that to sustain the charge would interfere with the managerial prerogative of the City to determine the nature and extent of police coverage and services.

The hearing examiner made the following findings after conducting a hearing on the complaint issued by the Secretary of the Board:

1. The City is an employer for purposes of the PLRA and Act 111. (City's answer, ¶ 2)

2. The FOP is the exclusive representative of a bargaining unit of police officers employed by the City. The bargaining unit includes all police officers except for the chief of police. The bargaining unit positions include patrolman, sergeant, lieutenant and captain. (City's answer, ¶ 1; N.T. 10–11)

3. In addition to the chief of police, the City currently employs one captain, two lieutenants, two sergeants and eight or more patrolmen.

4. The patrol schedule is posted in advance and includes four shifts: 7 a.m. to 3 p.m.; 3 p.m. to 11 p.m.; 11 p.m. to 7 a.m.; and 8 p.m. to 4 a.m. on Friday and Saturday nights. (N.T. 11–12)

5. Patrolmen rotate among all four shifts on a twelve-week rotating schedule. (N.T. 11)

6. The ordinary duties of a patrolman are patrolling the City and providing a police presence, and responding to calls from the Westmoreland County 911 Dispatch Center. Calls rotate from officer to officer on a given shift, and involve everything from barking dogs up to and including investigation. (N.T. 11, 14–20, 42–32)

7. Captains and lieutenants work all shifts except the 8 p.m. to 4 a.m. shift. Their work hours are listed on the supervisory schedule. (N.T. 12–14)

8. Sergeants are ordinarily included in the patrol schedule, unless they fill in for a higher-ranking officer on the supervisory schedule. (N.T. 12–14)

9. Lieutenants, captains and sergeants who fill in for higher-ranking officers differ from patrolmen in that they act as supervisors. However, for at least the last fifteen years, sergeants and lieutenants have also performed patrol duties. In more recent years, captains have also performed patrol duties. (N.T. 20–26)

10. Until recently, sergeants, lieutenants and captains did not ordinarily re-

---

1. Under Section 6(1)(a) and (e) of the PLRA, it is an unfair labor practice for an employer "[t]o interfere with, restrain or coerce employes in the exercise of the rights guaranteed in [the PLRA]" or "[t]o refuse to bargain collectively with the representatives of his employes...."

2. Section 1 of Act 111 provides in relevant part that "[p]olicemen or firemen employed by a political subdivision of the Commonwealth or by the Commonwealth shall ... have the right to bargain collectively with their public employers concerning the terms and conditions of their employment, including compensation, hours, working conditions, retirement, pensions and other benefits...."

spond to calls from the 911 dispatch center. However, as the number of patrolmen employed by the City has declined, these other members of the bargaining unit have also responded to 911 calls. (N.T. 20–26).

11. The City's chief of police works Monday through Friday on the daylight shift (7 a.m. to 3 p.m.), and is not part of the patrol schedule. (N.T. 11, 30–31)

12. The chief of police does not respond to calls from the 911 dispatch center. (N.T. 36)

13. The City's current chief of police is Jeffrey Stahl. Stahl was appointed to the position in November 2003. (N.T. 48–50)

14. On December 19, 2003, Chief Stahl worked an 8 p.m. to 4 a.m. shift in place of a patrol officer who had been scheduled to work, but was unable to do so. (City's answer, ¶ 4; N.T. 6–7, 69–70)

15. Before working the patrol shift on December 19, 2003, Chief Stahl did not attempt to fill the shift with a member of the bargaining unit. (N.T. 73–74)

16. The City has employed Richard O'Neal as a patrolman for over fifteen years. O'Neal is the chairman of the FOP's grievance committee. (N.T. 8–9)

17. From the beginning of O'Neal's employment until December 19, 2003, the City followed the following practice in filling a patrol shift. The shift would first be offered to patrol officers who were scheduled off, followed by sergeants, lieutenants or captains who were scheduled off, followed by patrol officers who were already working other shifts that day who were willing to work a double shift. (N.T. 8, 32–34)

18. From the beginning of his employment until December 19, 2003,

O'Neal was not aware of any occasion where the chief of police worked a patrol shift in place of a patrolman, sergeant, lieutenant or captain. (N.T. 8, 31–35, 47)

19. The City did not bargain with the FOP before the chief worked a patrol shift on December 19, 2003. (N.T. 99–100)

20. The chief worked a patrol shift on one or more occasions after December 19, 2003. (N.T. 83–87)

Relying upon *Wyoming Valley West Educ. Support Personnel Ass'n v. Wyoming Valley West School District*, 32 PPER (LRP) ¶ 32,008 (Final Order, 2000), the hearing examiner determined that the City committed an unfair labor practice when it failed to comply with its 14-year past practice of replacing bargaining unit members unable to work a patrol shift with fellow unit members and when it failed to bargain with the FOP over changes to the extent to which members and non-members of the unit would perform patrol shift work. He directed the City to cease and desist from refusing to bargain with the FOP; to rescind using the Chief of Police to fill the patrol shift without first offering unit members the opportunity to work; and to make them whole for any lost wages.

The Board determined that substantial evidence of record established that Chief Stahl's shift is separate from and in addition to the shifts allocated to bargaining unit members, noting that the patrol schedule is posted in advance and that the Chief in this instance had sufficient opportunity to substitute another bargaining unit member in the vacant fourth shift.[3] Because Chief Stahl assigned bargaining

3. The City presented evidence showing that on an occasion in December 1997, the former chief performed patrol work. The hearing examiner noted that the City failed to prove that the former chief replaced a bargaining

unit work to himself, he accordingly transferred work and hours from the unit without bargaining under the existing scheduling practice. The Board rejected the City's argument that the patrol work was not exclusively performed by the bargaining unit on each of the four shifts and that preserving the past practice would result in insufficient staffing for the City's public safety needs. The Board disagreed that its decision impacted upon the Chief's ability to perform police work and also noted that the City failed to prove the unavailability of bargaining unit members to fill the vacancy. It agreed that the City had the managerial prerogative to direct the assignment of work and to set hours and staffing levels, but based on *Wyoming Valley West* and other cases cited it held that the City committed an unfair labor practice when it transferred bargaining unit work outside of the unit.

The City argues that the Board erred in determining that bargaining unit members exclusively performed patrol shift work when the Chief is statutorily authorized to perform duties of a police officer and when no discernible quantum of work was removed from the bargaining unit and that it further erred by improperly segregating the work of a patrolman from police work in general. The City describes police work as providing a physical presence in the community, patrolling, enforcing laws and ordinances and investigating criminal offenses. It notes, in addition, that the ability to perform police work is an essential and integral requirement for any law enforcement official, and as stated in the dissenting and concurring opinion in *City of Philadelphia v. Pennsylvania Labor Relations Board,* 759 A.2d 40 (Pa.Cmwlth. 2000), the fact that officers are engaged in deskwork and administrative tasks does not mean they are not functioning as police officers.

[1] The City indicated that Chief Stahl does not have established working hours and that he normally works a daylight shift and performs administrative work as well as police work. By defining police work as the exclusive work for bargaining unit personnel, the Board precluded Chief Stahl from performing police officer duties and relegated him to performing only administrative assignments, and it essentially required him to bargain with the FOP even before responding to an accident or arresting a criminal. An employer has no duty to bargain over the transfer to other employees of work not performed exclusively by bargaining unit members. *AFSCME, Council 13 v. Pennsylvania Labor Relations Board,* 150 Pa.Cmwlth. 642, 616 A.2d 135 (1992). Moreover, the vacancy occurred in the fourth patrol shift on December 19, 2003 due to a patrolman's taking a vacation or a personal day, and although Chief Stahl decided to work the shift so as not to lose touch with what was occurring after 5:00 p.m. in the City, he did not remove an officer from the shift or substitute himself for an officer scheduled to work. Furthermore, the finding that the Chief's shift is separate from and in addition to the shifts allocated to bargaining unit members is not supported by the record.

The parties stipulated that there was no required minimum staffing level for the bargaining unit employees in any shift or minimum number of shifts available for bargaining unit work. The City submits that it is not required to bargain to allow its Chief of Police to perform police work, nor was it required to call out bargaining unit members for overtime. Unlike circumstances in *Wyoming Valley West* and in *City of Harrisburg v. Pennsylvania Labor Relations Board,* 146 Pa.Cmwlth. 242, 605 A.2d 440 (1992), the City merely permitted Chief Stahl to perform the same

unit member or denied unit members an opportunity to fill the shift.

duties he performed during his normal hours. Also, the Board's decision interferes with the City's managerial prerogative to determine the nature and extent of police coverage and services to be provided and its statutory authority to establish the number, grades and compensation for its police officers.

The Board cites *Midland Borough School District v. Pennsylvania Labor Relations Board,* 126 Pa.Cmwlth. 537, 560 A.2d 303 (1989), to support its position that courts have consistently approved the view that a unilateral removal of work from the bargaining unit for economic reasons without bargaining with the union constitutes an unfair labor practice.[4] The Board explained that so long as Chief Stahl followed the past practice of offering patrol shift work to bargaining unit members, he was free to perform whatever work he deemed appropriate, but once the City decided to provide shifts it was obligated to staff them with available unit members pursuant to its past practice. Additionally, the unilateral removal of the unit work cannot be disguised as managerial prerogative.

■ This Court's review of the Board's final order is limited to determining whether the Board has violated constitutional rights, whether it has committed an error of law or whether the necessary findings of facts are supported by substantial evidence in the record. *AFSCME, Council 13.* The Court is mindful of its limitations and the requirement that it afford deference to the Board's decision where it is supported by the law. *Id.* After its review of applicable case law, the Court is compelled to affirm the Board's final order. That is not to say, however, that the outcome would be the same under a different factual scenario, such as the unavailability of unit members to fill a vacancy occurring in a particular shift.

■ An unfair labor practice occurs when an employer unilaterally removes work that is exclusively performed by the bargaining unit without prior bargaining with the union, *see City of Harrisburg,* and the union has the burden of proving the charge. *City of Allentown v. Pennsylvania Labor Relations Board,* 851 A.2d 988 (Pa.Cmwlth.2004). An employer also commits an unfair labor practice when it alters a past practice related to assignment of bargaining unit work to non-unit members or varies the extent to which members and non-members of the unit have performed the same work. *AFSCME, Council 13.* A past practice becomes a part of expected terms and conditions of employment even though not explicitly included in the collective bargaining agreement. *South Park Twp. Police Ass'n v. Pennsylvania Labor Relations Board,* 789 A.2d 874 (Pa. Cmwlth.2002).

■ The Court concludes that the findings are supported by substantial evidence of record. There is no question that Chief Stahl is not a member of the bargaining unit and therefore is not part of the patrol shift schedule for members of the unit. The record shows further that unit members exclusively performed patrol shift work and that the City maintained a past practice in the event of a vacancy in the patrol shift of first offering the vacancy to patrol officers who were scheduled off

---

4. Intervenor FOP argues that the Board correctly determined that the City engaged in an unfair labor practice by unilaterally inserting Chief Stahl into the patrol shift. The relevant issue is the extent to which the Chief performs law enforcement work alongside bargaining unit members. This case does not merely involve Chief Stahl's performing his regular duties at a different time; rather, Chief Stahl changed his schedule to displace a bargaining unit member. The FOP only seeks to protect the bargaining unit members' right to work the patrol shifts.

work on the day in question, then offering the work to the sergeants, lieutenants or captains scheduled off that day and then offering it to patrol officers already working another shift but willing to work the added shift. The record shows, as well, that Chief Stahl had advance notice of the vacancy but chose to fill it himself. The law is clear that the City is not precluded from deciding the extent to which it will provide police coverage and services and that such decision falls within its managerial prerogative,[5] but the law is equally clear that when the vacancy occurred in the patrol shift it was incumbent upon the City to fill it with another member of the bargaining unit under past practice. *AFSCME, Council 13.*

The Court similarly must reject the argument that the Board's decision infringes upon the City's managerial prerogative to decide the quantity and quality of police coverage and services to be provided the City. As the Board stressed, it did not require the City to maintain a particular level of police staffing or impose overtime requirements. It simply held that where a vacancy occurred in patrol shift work, the City was required to fill it with a fellow bargaining unit member, absent evidence of the unavailability of another unit member. Accordingly, because the Board did not err in issuing the final order, it therefore is affirmed.

### ORDER

AND NOW, this 19th day of January, 2006, the final order of the Pennsylvania Labor Relations Board is hereby affirmed.

---

5. *See South Park Twp. Police Ass'n,* citing *Plumstead Twp. v. Pennsylvania Labor Relations Board,* 713 A.2d 730 (Pa.Cmwlth.1998), for the principle that managerial prerogative

encompasses decision making essential to the proper and efficient functioning of a police force.